[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11601
_____

D.C. Docket No. 1:11-cv-02486-SCJ


SAKARI JARVELA,

Plaintiff - Appellant,

versus

CRETE CARRIER CORPORATION,

Defendant - Appellee.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 28, 2015)

ON PETITION FOR REHEARING

Before TJOFLAT and COX, Circuit Judges.[*]

COX, Circuit Judge:

Sakari Jarvela's Petition for Panel Rehearing is granted.[1]  The prior opinion of the panel published at 754 F.3d 1283 is vacated, and this opinion is substituted for the prior panel opinion.

## INTRODUCTION

The plaintiff, Sakari Jarvela, sued his former employer, Crete Carrier Corporation, and asserted various claims under the Americans with Disabilities Act and the Family and Medical Leave Act.  These claims arose out of Crete's termination of Jarvela as a commercial motor vehicle driver.  Crete terminated Jarvela because, a week before Crete terminated him, a substance abuse treatment center had discharged Jarvela with a diagnosis of alcohol dependence.  The district court granted Crete summary judgment, concluding that Crete did not violate either the Americans with Disabilities Act or the Family and Medical Leave Act.  We affirm.

## I.  PROCEDURAL HISTORY and FACTS

### A.  Procedural History

Sakari Jarvela, a driver of commercial motor vehicles for Crete Carrier

---

[*] The Honorable Arthur L. Alarcón, United States Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation, heard argument in this case, but did not participate in this decision.  This decision is rendered by quorum.  28 U.S.C. § 46(d).

[1] Under Eleventh Circuit Rule 35-5, "[a] petition for rehearing en banc will also be treated as a petition for rehearing before the original panel," which is how we are treating Jarvela's petition.

2

Corporation, sued Crete, a motor carrier regulated by the Department of Transportation, in the Northern District of Georgia.  Count I of Jarvela's complaint alleges that Crete terminated him in violation the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA").   Count II alleges interference and retaliation claims under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA") based on Crete's alleged failure to reinstate Jarvela following the conclusion of his Crete-approved "leave to care for his … serious health condition."

After the close of discovery, Crete filed a motion for summary judgment on all of Jarvela's claims.  Jarvela responded.  The district court granted Crete summary judgment on all claims.  As to the ADA claim, the district court held that Jarvela could not establish a prima facie case.  The district court reasoned that because he had "a current clinical diagnosis of alcoholism" within the meaning of Department of Transportation ("DOT") regulations (specifically 49 C.F.R. § 391.41(b)(13)), Jarvela was not a "*qualified* individual." (Doc. 40, Order at 4) (emphasis added).  The district court found the FMLA interference claim meritless because of unrebutted record evidence indicating that, regardless of Jarvela's FMLA leave, Crete would have terminated him because of his "current clinical diagnosis of alcoholism."  The district court found the FMLA retaliation claim meritless because Jarvela failed to produce evidence of the required causal

3

connection between his taking FMLA leave and his termination.  Jarvela appeals.

## B.  Facts

### 1.  Jarvela's Employment and Crete's Job Description for Commercial Motor Vehicle Drivers

According to Vice-President of Safety and Compliance Ray Coulter, Crete Carrier Corporation employed approximately five thousand commercial motor vehicle drivers.  Coulter had ultimate responsibility for these drivers.  Crete employed Jarvela as an over-the-road commercial motor vehicle driver in its National Fleet from November 2003 until April 2010.  His base was Crete's Marietta, Georgia, facility, and his supervisor was Fleet Manager Bill Hough.

Crete had a written job description for the commercial motor vehicle driver position held by Jarvela.  According to Jarvela, the job description is accurate. Under the heading, ESSENTIAL DUTIES AND RESPONSIBILITIES, the first entry is "[q]ualifies as an over the road driver pursuant to U.S. Department of Transportation ('DOT') regulations."  The DOT regulations implicated by that job description and relevant to resolution of this appeal are the following: (1) 49 C.F.R. § 391.11(a), which forbids a motor carrier to permit a person to drive a commercial motor vehicle if he is not qualified to do so under DOT regulations; (2) 49 C.F.R. § 391.41(a)(3)(i), which states that a commercial motor vehicle driver must "meet[] the physical qualification standards in paragraph (b) of  this section"; and (3) 49 C.F.R. § 391.41(b)(13), which establishes as one of the

4

"physical qualification standards [under paragraph (b) of this section]" that the person have "no current clinical diagnosis of alcoholism."

2. Jarvela's Clinical Diagnosis and Treatment for Alcoholism

In March 2010, Jarvela reported to his personal physician, Dr. James Marshall, that he had difficulties with alcohol use. Although Dr. Marshall did not memorialize Jarvela's self-reported difficulties with alcohol use, he did refer Jarvela to Bradford Health Services for thirty days of intensive outpatient treatment. Asked at his deposition whether he agreed with Dr. Marshall's assessment as to his need for rehabilitation for his drinking, Jarvela answered, "Yes, I did."

Jarvela requested FMLA leave for the duration of his treatment, which Crete granted. Richard Yoakum, Jarvela's primary counselor at Bradford Health Services, completed a Certification of Health Care Provider for Employee's Serious Health Condition, which Jarvela's attending physician at Bradford, Dr. Jerry Howell, signed. Bradford Health Services forwarded this document to Crete. At the top of the first page of this document, under Part A: Medical Facts, is an indication of "Probable duration of condition." The handwritten answer is, "[c]hronic."

5

### 3. Jarvela's Return-to-Work Medical Certification

Jarvela completed his treatment for alcoholism at Bradford Health Services on April 20, 2010. On April 22, he visited his personal physician, Dr. Marshall, who gave him a Crete-prepared Return to Work Certification. Dr. Marshall noted on the certification that Jarvela had been discharged from Bradford and could return to work with no restrictions. Jarvela then notified Bill Hough, manager of Crete's Marietta facility, that he had completed his treatment, that he had been certified to return to work by his personal physician, and that he wanted to return to work. Hough told him to complete his fitness-for-duty examination through Concentra Medical Centers, Crete's medical examination contractor for drivers, and to report on Monday morning, April 26.

Jarvela arrived at Crete's Marietta facility on April 26, and then proceeded immediately to get his medical certification at Concentra, which, according to Jarvela, was "standard operating procedure." Concentra's Dr. Alejandro Alam-Gonzalez ("Dr. Alam") examined Jarvela. After the examination, Dr. Alam prepared a Medical Examination Report For Commercial Driver Fitness Determination ("Concentra Examination Report"). In Section 2 on the first page of the "Health History," Dr. Alam checked the box beside "Regular, frequent alcohol use." On the bottom, right-hand corner of the last page of the report, Dr. Alam wrote "See letter from Counselor regarding ETOH." That letter, addressed to

6

Concentra Medical Centers and dated April 26, 2010, was from Richard Yoakum, Jarvela's primary counselor at Bradford Health Services. The letter said that Jarvela "is able to return to his regular work responsibilities ("Commercial DOT Driver") without restriction." The letter listed Jarvela's diagnosis as "Alcohol Dependence" and "suggested that Sakari attended AA/NA meetings (at least 3 a week), keep calling his sponsor, and attending a continuing care meeting or one time a week for two years. In my opinion, Sakai's prognosis is fair to good if recommendations are followed." On the last page of the Concentra Examination Report, in the set of boxes at the very bottom, Dr. Alam checked the third box from the top in the left-hand column, beside "Meets standards, but periodic monitoring required due to HTN [hypertension]." He testified at his deposition that he "should have maybe added ETOH, alcohol." Dr. Alam gave Jarvela a "six-month card" and added, "[i]f no problem then may up to one year."

4. Jarvela's "Current" Clinical Diagnosis of Alcoholism

Bradford Health Services discharged Jarvela on April 20, 2010, from a thirty-day intensive outpatient program for the treatment of alcoholism. Dr. Marshall, Jarvela's personal physician, had prescribed the treatment to Jarvela on March 17, 2010. When asked at his deposition whether Jarvela "suffers from alcoholism," Dr. Marshall, Jarvela's personal physician, answered, "Yes, I would say he does." According to Dr. Marshall, Jarvela is "in remission," but he pointed

out that "you … always carry the diagnosis."  Dr. Alam, who cleared Jarvela to return to work after the April 26 Concentra Medical Centers medical examination, testified, "[A]n alcoholic is an alcoholic for life.  That's not an understatement or an overstatement."  Richard Yoakum, Jarvela's primary counselor at Bradford Health Services, testified at his deposition that the reference to "chronic" on the FMLA certification meant, "forever."  Yoakum's colleague, Rachel Patterson, confirmed Yoakum's opinion in her explanation as to why recovering alcoholics in Alcoholics Anonymous ("AA") introduce themselves as "alcoholic" for as long as they live.

### 5.  Jarvela's Termination

Dr. Alam signed Jarvela's Medical Examiner's Certification on April 26, 2010.  On its face, the certificate expired on October 26, 2010.  Jarvela reported for work at the Marietta facility on the morning of April 27, when Ray Coulter, Crete's Vice-President of Safety and Compliance, located in Lincoln, Nebraska, terminated him in a conference call in which Fleet Manager Bill Hough also participated.

Prior to the call, Coulter had reviewed documents that had been forwarded to him, including the Concentra Examination Report prepared by Dr. Alam, and the Bradford Health Services letter attached to and referenced in it, which Jarvela's primary counselor, Richard Yoakum, prepared and Jarvela's attending physician at

8

Bradford, Dr. Jerry Howell, signed. Coulter consulted Crete's legal department about his concerns that the documents he was reviewing revealed a "current diagnosis of alcoholism." When asked whether he disagreed with medical certifications that Jarvela could return to work, Coulter testified that whether he disagreed or not with medical opinions did not matter. His responsibility was to determine whether Jarvela was qualified to drive for Crete under the written job description and the DOT regulations.

According to Jarvela, everyone identified themselves at the beginning of the conference call, then the termination discussion ensued. Coulter told Jarvela that he had reviewed and discussed with Crete's legal department documentation from which he concluded that Jarvela had a "current clinical diagnosis of alcoholism" under DOT regulations. He also had reviewed the discharge letter from Bradford Health Services stating that Jarvela's prognosis was fair to good if he attended at least three AA meetings a week, called his sponsor, and attended an aftercare meeting once a week for two years. Coulter concluded that Jarvela was not qualified to drive any Crete commercial motor vehicle for any distance. According to Jarvela, Coulter also said that Crete simply could not "accommodate" a long-haul driver with the continuing-care recommendations listed in the Bradford Health Services letter.

## II.  ISSUES ON APPEAL

There are three issues presented by this appeal: (1) whether the district court erred in granting Crete summary judgment on Jarvela's ADA termination claim; (2) whether the district court erred in granting Crete summary judgment on Jarvela's FMLA interference claim; and (3) whether the district court erred in granting Crete summary judgment on Jarvela's FMLA retaliation claim.  We address these issues serially in the Discussion section.

## III.  STANDARDS OF REVIEW

We review de novo a district court's grant of summary judgment.  We draw in favor of the non-movant all reasonable inferences from the evidence we consider.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).  We may affirm a district court's summary judgment "on any ground that finds support in the record," even if it is not the basis articulated by the district court.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (quoting *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S. Ct. 307, 308 (1957)).

## IV.  DISCUSSION

### A.  ADA Claim

#### 1.  Was "No Current Clinical Diagnosis of Alcoholism" a Qualification for Jarvela's Job?

##### (a)  Crete's Written Job Description for Commercial Motor Vehicle Drivers

The Americans with Disabilities Act forbids a "covered entity" from discharging "a qualified individual on the basis of disability." 29 U.S.C. § 12112(a).  In order to state a prima facie discriminatory termination claim under the ADA, a plaintiff must show three things: (1) he is disabled; (2) he is a qualified individual; and (3) he suffered unlawful  discrimination because of his disability. *Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1132 (11th Cir. 1996).[2]

The dispositive factor is the second element of Jarvela's prima facie case: whether Jarvela was a *qualified* individual.  Jarvela had to produce evidence sufficient to persuade a reasonable jury that at the time he was terminated he "satisfie[d] the requisite skill, experience, education and other job-related requirements of the employment position" from which Crete terminated him, and that, "with or without reasonable accommodation, [he could] perform the essential functions of the position." 29 C.F.R. § 1630.2(m).[3]

Crete's written job description is considered evidence of the essential functions of a particular position. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th

---

[2] We assume, arguendo, that Jarvela had a covered disability when Crete terminated him. Consequently, we do not address any contentions of the parties concerning the presence or absence of a disability.

[3] Jarvela has waived his reasonable accommodation claim because the supporting contention he makes in this court (that his six-month certificate was the only accommodation he needed) and the supporting contention he made in the district court (a transfer to a different driving position would have constituted reasonable accommodation) are materially different.  We do not consider contentions raised for the first time on appeal. *Access Now, Inc. v. Southwest Airlines, Inc.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

11

Cir. 2000) (citing 42 U.S.C. § 12111(8)).   The written job description for a commercial motor vehicle driver provides, in part, that the driver must "[qualify] as an over the road driver pursuant to U.S. Department of Transportation ('DOT') regulations."

Crete contends that a commercial motor vehicle driver's being qualified under the DOT regulations was an essential function of Jarvela's job at the time Crete terminated him.   The district court agreed.   Jarvela's inability to meet a criterion of the "physical qualification standards" regulation—in particular, the requirement that he have "no current clinical diagnosis of alcoholism"—precluded him from "performing" an essential function of his job as a motor vehicle driver. The logic of this conclusion within the context of the regulations is discussed in the following subsection.

(b) The Regulatory Framework Embraced by Crete's Job Description

Congress and the Equal Employment Opportunity Commission permit covered entities subject to DOT qualification standards to require that their employees comply with those standards.   *See* 42 U.S.C. § 12114(c)(5)(C) ("A covered entity . . . may  . . . require that  . . . employees comply with the standards established in . . . regulations of the Department of Transportation . . . ."); 29 C.F.R. § 1630.16(b)(5) ("A covered entity . . . [m]ay require that its employees employed in an industry subject to such regulations comply with the standards

12

established in the regulations (if any) of the . . . Department of Transportation …

regarding alcohol . . . .").  The DOT regulations material to determining whether

Jarvela was a "qualified individual" are three.  First, 49 C.F.R. § 391.11(a) forbade

Crete to permit Jarvela to drive a commercial motor vehicle if Jarvela was not

"qualified to drive a commercial motor vehicle."    Second, 49 C.F.R. §

391.41(a)(3)(i) said that Jarvela had to "meet[] the physical qualification standards

in paragraph (b)" of  Section 391.41.  Because one of those "qualification

standards in paragraph (b)" of Section 391.41 was that Jarvela have "no current

clinical diagnosis of alcoholism,"   Jarvela then could not perform an essential

function of Crete's job description (and, indeed, Crete could not allow him to drive

a commercial motor vehicle), unless he had "no current clinical diagnosis of

alcoholism."[4]  We turn now to Jarvela's contention that he did not have a "current"

clinical diagnosis of alcoholism at the time Crete terminated him.

2.  Existence of "A Current Clinical Diagnosis of Alcoholism"

Crete terminated Jarvela on April 27, 2010.  Crete terminated Jarvela

because he had a "current clinical diagnosis of alcoholism" and, therefore, was not

qualified under DOT regulations and Crete's written job description to drive

commercial motor vehicles.  Crete based its decision on Jarvela's discharge

---

[4] In the context of reciting these regulations, we note that Jarvela has raised for the first time in his petition for rehearing a contention that Crete should have engaged in an administrative resolution procedure set forth in 49 C.F.R. § 391.47.  This was not presented in Jarvela's appellate brief and we do not consider it.

diagnosis of "alcohol dependence" provided by Bradford Health Services a week earlier on April 20, 2010.[5]  In their earlier FMLA letter to Crete, Yoakum and Jarvela's attending physician at Bradford Health Services, Dr. Jerry Howell, had indicated that Jarvela's condition was "[c]hronic."  "Chronic" means "marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness." WEBSTER'S THIRD NEW INT'L DICTIONARY 402 (Merriam-Webster 1981).  Dr. Marshall, Jarvela's physician, characterized the diagnosis of alcoholism as one "[you] always carry."  Dr. Alam testified that "an alcoholic is an alcoholic for life."  Despite this and other evidence reviewed in subsection I(B)(4), *supra*, Jarvela contends that his clinical diagnosis of alcoholism was not "current" under 49 C.F.R. § 391.41(b) when Crete terminated him.  We are not persuaded by this contention.

(a)  Timing of the Diagnosis Relative to Jarvela's Termination

Jarvela does not and could not reasonably contend that a seven-day-old diagnosis of alcoholism was not "current" at the time of his termination.  We are not prepared to draw a bright line as to how much time must pass before a diagnosis of alcoholism is no longer "current," but we hold that a seven-day-old diagnosis is "current" under 49 U.S.C. § 391.41(b)(13).  Jarvela did not "lose" his clinical diagnosis between his discharge from Bradford Health Services on April

---

[5] Jarvela did not contend in the district court, nor does he contend on appeal, that "alcohol dependence" and "alcoholism" are not materially equivalent, but we accept that they are.

20 and his termination by Crete one week later.

### (b) The Misconstruction of Dr. Alam's Testimony

Jarvela's brief also relies on and takes out of context Dr. Alam's deposition testimony in support of Jarvela's contention that his diagnosis was not "current." The following exchange occurred at the beginning of a lengthy (and unsuccessful) effort by Jarvela's lawyer to force Dr. Alam to admit that Jarvela did not have a "current clinical diagnosis of alcoholism" when Crete terminated Jarvela:

> Q. Okay. And did you determine that Mr. Jarvela—when you gave Mr. Jarvela his six-month certification that he had no current clinical diagnosis of alcoholism—
>
> A. I determined that the [substance abuse professional] agreed that he was doing well—an alcoholic is an alcoholic for life. That's not an understatement or an overstatement. But that he was doing what was necessary to stay dry. Through the [substance abuse professional] I determined that to be.
>
> Q. Okay. But the regulations, just so I'm clear, 391.41(b)(13) states, "That a person is physically qualified to drive a motor vehicle if that person has no current clinical diagnosis of alcoholism."[6]
> Did you determine—
>
> A. *I determined exactly that*. That the [substance abuse professional] says that he's dry. That means currently he's not having a problem with alcoholism.

No reasonable jury could conclude that "I determined exactly that" referred to the regulatory quote in the question posed by Jarvela's counsel. Indeed, Jarvela's

---

[6] Jarvela's counsel collapsed Sections 391.11(b)(4), 391.41(a)(a)(3)(i), and 391.41(b)(13), but his synopsis is materially accurate.

counsel never finished asking Dr. Alam what it was that Dr. Alam had "determined" before Dr. Alam stepped in with an answer repeating what he already had said: that the substance abuse professional (Bradford Health Services) said Jarvela was stable on discharge, and Dr. Alam thought that he looked fine on April 26, when he presented for his physical.  And yet this sentence—"I determined exactly that"—is *all* Jarvela cites from the record in support of his argument that his alcoholism diagnosis was not "current."  We reject Jarvela's contention that Dr. Alam's answer, taken completely out of context, raises a genuine issue of fact as to whether Jarvela's clinical diagnosis of alcoholism was "current."

We hold that Crete Carrier Corporation did not violate the ADA by terminating Sakari Jarvela on the basis of Bradford Health Services's diagnosing Jarvela with alcohol dependence seven days before the termination; Crete was entitled to rely on Bradford Health Services's diagnosis in reaching the conclusion that Jarvela had "a current clinical diagnosis of alcoholism." 49 C.F.R. §391.41(b)(13).  Because Jarvela had a "current clinical diagnosis of alcoholism," he could not qualify as a commercial motor vehicle driver under DOT regulations and perform all of the essential functions of Crete's commercial motor vehicle driver job.  We render no opinion as to the meaning of "current" in any other

statutory or regulatory context governing employer-employee relations.[7]

For these reasons, the district court properly granted summary judgment to Crete on Jarvela's ADA claim.

## B. FMLA CLAIMS

### 1. The Interference Claim

In order to state an interference claim under the FMLA, an employee need only demonstrate by a preponderance of the evidence that he was entitled to a benefit the employer denied. *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1205 (11th Cir. 2001). An employee has the right following FMLA leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. § 2614(a)(1)(A); s*ee also* 29 C.F.R. § 825.214(a). But, an employer can deny reinstatement following FMLA leave if it can demonstrate that it would have discharged the employee even if he had not been on FMLA leave. *Martin v. Brevard Cnty. Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008); *see*

---

[7] Because the "no current clinical diagnosis of alcoholism" criterion is decisive in this case, we express no opinion as to whether Crete could or did apply more stringent internal criteria to Jarvela's situation. Nor do we address Jarvela's arguments that he did not pose a "direct threat" to himself or others, s*ee* 29 C.F.R. § 1630.2(r) (employer may defend employment decision if employee poses "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation"), or that the district court "sidestepped" the direct threat analysis by couching as a prima facie qualification Crete's drivers' being able to meet the "no current clinical diagnosis of alcoholism" criterion. Crete's correct determination that Jarvela had a "current clinical diagnosis of alcoholism" ended the ADA discrimination inquiry in this case.

*also* 29 U.S.C. § 2614(a)(3); 29 C.F.R. §  825.216(a).

Jarvela contends that Crete improperly denied him the benefit of returning to the same or an equivalent position following his FMLA leave.  Crete, instead, contends that it would have discharged Jarvela because he had a "current clinical diagnosis of alcoholism" regardless of whether he had taken FMLA leave.  The district court found that, "Regardless of whether Mr. Jarvela had taken FMLA leave, there [was] ample, unrebutted evidence in the record to indicate that Crete would have discharged him upon learning of his diagnosis of alcohol dependence." (Doc. 40 at 19).  Crete put forward evidence that it would have discharged Jarvela regardless of his FMLA leave, and Jarvela presented no evidence disputing it. Consequently, we agree with the district court's determination that Jarvela's interference claim fails.

## 2. Retaliation Claim

The FMLA prohibits an employer from discriminating against an employee for exercising a right under the FMLA. 29 U.S.C. § 2615(a)(2).  To establish a prima facie case of retaliation under the FMLA, an employee must show that, "(1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Martin*, 543 F.3d at 1268.  The district court held that Jarvela failed on the third prong of this test; he could not show that Crete's decision to terminate him was

causally related to his FMLA leave.

Jarvela argues that two factors sufficiently establish a causal connection: Coulter—Crete's vice president who fired him—had access to his personnel file containing a notation that he was out on FMLA leave, and that his termination occurred as he attempted to return from FMLA leave. Crete argues that Coulter did not have actual knowledge that Jarvela was returning from FMLA leave.

Crete has the better position. Coulter said that he played no part in approving Jarvela's FMLA leave request, and that he was unaware that Jarvela had taken FMLA leave. He also testified that he only reviewed certain parts of Jarvela's records before terminating him, and that none of the parts he reviewed mentioned Jarvela's FMLA leave. Furthermore, Jarvela concedes that two of the most important documents Coulter relied on in terminating Jarvela—a letter from Jarvela's alcohol treatment counselor and a discharge form from Jarvela's treatment program—did not mention in any way the FMLA.

Jarvela had the burden of proving Crete's actual knowledge of his FMLA leave. He presented no evidence to rebut Coulter's testimony. Temporal proximity alone is insufficient to establish a causal connection in the absence of actual knowledge by the employer. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010). Accordingly, summary judgment in favor of Crete on Jarvela's retaliation claim was properly granted.

19

## V. CONCLUSION

We affirm summary judgment in favor of Crete Carrier Corporation on all claims.

**AFFIRMED.**